**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TODD JAROD FUNDERMANN,<br><br>Defendant. | No. CR08-4033-DEO<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

The defendant Todd Jarod Fundermann is charged in this case with possession of a firearm while he was the subject of a domestic restraining order as provided by 18 U.S.C. § 922(g)(8). *See* Doc. No. 1. This matter is before the court on Fundermann's motion to suppress evidence obtained during and as the result of a traffic stop that occurred on February 25, 2008. Doc. No. 8. The plaintiff (the "Government") has resisted the motion. Doc. Nos. 14 & 15. The court held an evidentiary hearing on the motion on May 7, 2008, at which Assistant U.S. Attorney Kevin Fletcher appeared on behalf of the Government, and Fundermann appeared in person with his attorney, Alexander Esteves. The Government offered the testimony of Cherokee County Sheriff Dave Scott, Officer Brett Gannon of the Cherokee Police Department, Cherokee County Deputy Sheriff Jeff Friedrichsen, Special Agent Scott Edward Lamp of the Iowa Division of Criminal Investigation, and Iowa State Troopers John Farley, Jeremy Probasco, and Chris Barber.

Three exhibits were admitted into evidence at the hearing, to-wit: **Def. Ex. A** - a DVD containing video and audio of conversations immediately preceding the February 25, 2008, traffic stop, and of events that occurred at the scene of the traffic stop immediately after the vehicle was stopped; **Gov't Ex. 1** - a DVD containing video of events that occurred at the scene of the traffic stop immediately after the vehicle was stopped; and **Gov't Ex. 2**, Search Warrant for a search of Fundermann's residence in Cleghorn, Iowa, issued February 25, 2008, in Cherokee County Case No. 080238S, together with the

application for the search warrant, and related documents (17 pages). (Gov't Ex. 2 is docketed of record as Doc. No. 16.)

The following facts are pertinent to consideration of Fundermann's motion. On February 25, 2008, Cherokee County Deputy Sheriff Jeff Friedrichsen received information from two different sources indicating Fundermann was trafficking in large quantities of marijuana. The first source of information was relayed by Cherokee County Sheriff Dave Scott. During the three weeks prior to February 25, 2008, Sheriff Scott met on two occasions with a confidential informant ("CI-1"), who was cooperating with law enforcement in an attempt to reduce OWI charges pending against the CI. CI-1 had been to Fundermann's residence, and he provided information indicating Fundermann was trafficking in marijuana in the Cherokee, Iowa, area. On February 25, 2008, CI-1 called Scott to report that the CI had been at Fundermann's residence in Cleghorn, Iowa, that day, and Fundermann was planning to transport about four pounds of marijuana to Sioux City, Iowa, that afternoon. CI-1 indicated Fundermann and another individual planned to leave for Sioux City at around 3:30 p.m., and they would be driving a late model, silver Chevrolet Cobalt vehicle bearing Nebraska license plates. CI-1 also provided the license plate number. Scott took no steps to corroborate CI-1's information, but he relayed the information to Deputy Friedrichsen.

The second source of information was relayed by Officer Brett Gannon of the Cherokee Police Department. On or about February 23, 2008, Officer Gannon received information from another confidential informant ("CI-2") that Fundermann had returned recently from Colorado with approximately thirteen pounds of marijuana. CI-2 stated the CI's family members were buying marijuana from Fundermann. At the time Gannon received this information, he was aware that Fundermann had been charged in 2003 with possession of marijuana with intent to deliver, within 1,000 feet of a protected location; possession of paraphernalia; and a drug tax stamp violation. Gannon had participated in a search at Fundermann's residence in 2003, and the seizure of a quantity of marijuana that

led to the 2003 charges. On February 25, 2008, Gannon relayed the information from CI-2 to Friedrichsen. Gannon took no steps to corroborate CI-2's information.

When Friedrichsen received the information from Scott and Gannon, he ran the license plate number provided by CI-1, and determined that the vehicle bearing that license plate belonged to Kevin or Chris Knebel, known associates of Fundermann's. Because he was busy at an accident scene, Friedrichsen contacted Iowa State Trooper Chris Barber, who was working in the Sioux City area, and relayed the information officers had obtained from CI-1 and CI-2, and the information about the vehicle. Friedrichsen also apparently indicated there might be a firearm involved in the transport of the marijuana; however, the record does not indicate the source of this information.

At the time Trooper Barber received the information from Friedrichsen, Barber was on the Highway 75 bypass just north of Leeds. He called Troopers John Farley and Jeremy Probasco to relay the information, and the three troopers agreed to watch for the Chevrolet Cobalt. At approximately 4:30 p.m., Barber observed the vehicle traveling south on Highway 75.[1] He advised Troopers Probasco and Farley that he had seen the vehicle. He also notified his duty sergeant that he was going to follow the vehicle to watch for traffic violations that would allow him to stop the vehicle.

At about the same time, Special Agent Scott Lamp of the Iowa Division of Criminal Investigation was leaving his office and he heard the radio conversations between Troopers Barber, Probasco, and Farley. He knew the troopers drove marked patrol cars, whereas Lamp drove an unmarked vehicle, so he contacted Barber and offered to assist in surveillance of the Cobalt. Lamp then became the lead vehicle following the Cobalt, while the troopers traveled on parallel routes to remain close by. Lamp observed the vehicle's two occupants go into a Petco store on Hamilton Boulevard, stay for about ten minutes,

---

[1] Trooper Barber testified this timing was consistent with the vehicle having left Cleghorn at approximately 3:30 p.m.

3

and then return to the vehicle and drive away. Lamp continued to follow the vehicle, but initially, he did not see any traffic violations that would justify stopping the vehicle.

Barber contacted Assistant Woodbury County Attorney Mark Campbell to ask if the officers had enough information to stop the vehicle without observing a traffic violation. Campbell wanted more information, and Barber asked Friedrichsen to contact Campbell.[2] According to Friedrichsen, after he relayed the information to Campbell that had been provided by the two CIs, Campbell advised he was comfortable with the officers stopping the vehicle without observing a traffic violation.[3] Friedrichsen called Barber and relayed this information, and Barber passed the information along to Probasco, Farley, and Lamp. However, before the vehicle was stopped based on the intelligence provided by the CIs, Lamp observed the Cobalt fail to stop at a stop sign, and make a turn without using a turn signal. He decided to stop the vehicle for the traffic violations. His unmarked police car was equipped with emergency lights and a siren, and he activated his emergency lights and stopped the Cobalt. He told the driver and passenger to put their hands where he could see them, and he then waited for the troopers to arrive at the scene.

Farley and Probasco arrived at the scene of the traffic stop at about the same time. Both troopers were in uniform and were driving marked patrol cars. They approached the Cobalt together, with Farley approaching the driver's side of the vehicle and Probasco approaching the passenger's side. As he was approaching the driver, Farley noticed the Cobalt's interior was extremely clean. The only personal item in sight was a black duffel bag on the back seat behind the passenger. When Farley reached the driver, he immediately smelled the odor of raw marijuana (as opposed to burnt, already smoked marijuana). Farley testified has been trained to detect the odor of raw and burnt

---

[2] Barber and Friedrichsen had been in telephone contact several times during the day to discuss the status of the case.

[3] The record is not clear as to whether Campbell had concluded the officers had probable cause to stop the vehicle, or only "reasonable suspicion" to stop the vehicle based on the information from the CIs. However, the court finds the distinction is irrelevant for purposes of Fundermann's motion to suppress.

4

marijuana, as well as other drugs, and he has had field experience with those smells. Farley did not communicate to Knebel or the other officers that he had smelled the marijuana.

Farley asked the driver for his license, registration, and insurance verification, from which he identified the driver as Chris Knebel. He instructed Knebel to stay in the car. He did not inform Knebel about why he had been stopped, assuming Lamp had already done so. On the passenger's side of the vehicle, Probasco directed Fundermann to get out of the car. When Fundermann opened the door and got out of the Cobalt, Probasco detected the smell of raw marijuana, and he saw the black duffel bag in the back seat of the car. Barber arrived on the scene, and he went to the passenger's side of the Cobalt to assist Probasco. Probasco gave Barber a "thumbs up" sign, indicating there was something suspicious about the vehicle.

When Fundermann got out of the car, Probasco asked if he had anything illegal on his person like weapons or drugs. Fundermann responded, "No," and he consented to a pat-down search, which Probasco conducted for purposes of officer safety. Probasco then asked Fundermann to step back to Farley's patrol car, and Probasco and Farley placed Fundermann in the patrol car to stay warm while the officers continued their investigation.[4] Farley asked Fundermann some general questions about where he and Knebel were going, where they were coming from, and the like.

While Fundermann was placed in Farley's patrol car, Barber walked around to the driver's side of the Cobalt to talk with Knebel.[5] Barber told Knebel the officers had stopped the vehicle based on the information from the two CIs. He asked Knebel if there was anything illegal in the car, and Knebel said there was nothing illegal to his knowledge.

---

[4]Farley testified the weather was cold that day, with below-freezing temperatures, sleet and snow, and there was some ice on the roadway.

[5]The vehicles at the scene were arranged in the following order: the Cobalt was first; Lamp's unmarked car was second; Farley's marked patrol car was third; Barber's marked patrol car was fourth; and Probasco's marked patrol car was off to the side in a parking area.

5

Barber asked who owned the black duffel bag, and Knebel indicated Fundermann owned the bag. Knebel stated Fundermann had offered to pay for gas and lodging if Knebel would drive him to Sioux City, and he thought the black bag was an overnight bag. Barber asked Knebel to get out of the car. Probasco assisted in patting Knebel down for weapons, and then Barber and Probasco put Knebel in Probasco's patrol car to wait while the investigation continued.[6]

Barber retrieved the black duffel bag from the back of the Cobalt, looked inside, and saw a number of sealed plastic bags containing what he believed to be marijuana. He carried the bag to the hood of Farley's patrol car, where he removed the contents from the bag to determine exactly what the duffel bag contained. He counted eight separate packages of suspected marijuana in the bag. Barber then told Farley and Probasco to place Fundermann and Knebel under arrest. Probasco handcuffed Knebel and advised him of his *Miranda* rights.[7]

Farley placed Fundermann under arrest and read him his *Miranda* rights, which Fundermann indicated he understood. Farley asked Fundermann if he had anything else on him, and Fundermann stated he had some personal use marijuana in his sock. Farley asked if the black duffel bag belonged to Fundermann, and Fundermann responded, "Yes." Fundermann also admitted he had smoked marijuana earlier that day, but according to Farley, Fundermann did not appear to be impaired in any way. He appeared to have no difficulty understanding what was said to him, and he responded appropriately to Farley's questions. Later, at the jail, Fundermann admitted the duffel back and its contents belonged to him, and he stated Knebel did not know there was marijuana in the bag.

---

[6] Knebel later was transferred to Barber's patrol car when Probasco was called to the scene of an accident.

[7] Knebel was never cited for the traffic violations.

Based on discovery of the marijuana during the traffic stop, and Fundermann's admission that the marijuana was his, Deputy Friedrichsen applied for and obtained a search warrant for Fundermann's residence in Cleghorn, Iowa. The search was conducted later the same day, and officers seized contraband, drug notes, a firearm, and other items. *See* Doc. No. 16. The firearm discovered during the search forms the basis for the current charge against Fundermann.

*Discussion*

In his motion and brief, Fundermann makes much of the fact that none of the officers took steps to corroborate the information provided by the two CIs. However, as the facts of the case played out, no examination of this issue is relevant. Agent Lamp ended up observing traffic violations, and he stopped the Cobalt on that basis. The court finds Agent Lamp's testimony on this subject to be believable and persuasive. Once Lamp observed the traffic violations, the officers could stop the vehicle, even if the stop was pretextual and their actual motivation was to investigate the possibility that there was marijuana in the vehicle. As the Eighth Circuit has held repeatedly, "'Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc)). Moreover, "[a]n otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'" *Id.* (quoting *United States v. Williams*, 429 F.3d 767, 771 (8th Cir. 2005), in turn citing *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996)).

Having made a lawful traffic stop, the officers could have arrested Knebel for the traffic violations. *See* Iowa Code § 804.7. If Knebel had been arrested for the traffic violations, the officers could have searched the passenger compartment of the car incident to the arrest, and because the black duffel bag was within Knebel's reach, they also could

7

have examined the contents of the bag. *See United States v. Poggemiller*, 375 F.3d 686, (8th Cir. 2004) (citing, *inter alia*, *New York v. Belton*, 453 U.S. 454, 160, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768 (1981); other citations omitted).

In this case, however, Knebel was not arrested on the basis of the traffic violations. Rather, once the officers smelled marijuana in the vehicle, they had probable cause to search the vehicle under the "automobile exception" to the warrant requirement. *See United States v. Caves*, 890 F.2d 87, 89-90 (8th Cir. 1989) (citing, *inter alia*, *Chambers v. Maroney*, 399 U.S. 42, 90 S. St. 1975, 26 L. Ed. 2d 419 (1970)); *California v. Carney*, 471 U.S. 386, 392, 105 S. Ct. 1066, 2072, 85 L. Ed. 2d 406 (1985).

The court finds the traffic stop and subsequent search of the vehicle were lawful. Discovery of the marijuana, bolstered by Fundermann's admissions of ownership, provided probable cause for his arrest, and further provided probable cause for the officers to apply for the search warrant. The search warrant was supported by probable cause even if the information supplied by the CIs had been omitted, and the affiant had cited only discovery of the marijuana at the scene of the traffic stop and Fundermann's admission of ownership.

Fundermann has failed to show any legal basis for suppression of the evidence found at the scene of the traffic stop or seized during execution of the search warrant at Fundermann's residence, including the firearm described in the Indictment, and his motion to suppress should be denied.

Any party planning to file objections to this Report and Recommendation must order a transcript of the suppression hearing **by May 9, 2008**, **regardless of whether the party believes a transcript is necessary to argue the objection**. If an attorney files an objection to this Report and Recommendation without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

Objections to this Report and Recommendation must be filed by **May 15, 2008**. Responses to objections must be filed by **May 20, 2008**.

**IT IS SO ORDERED.**

**DATED** this 8th day of May, 2008.

*[signature: Paul A. Zoss]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT